Robert SAMUELS, Petitioner–Appellee,

v.

Louis F. MANN, Superintendent, Shawangunk Correctional Facility, Respondent–Appellant.

No. 407, Docket 93–2351.

United States Court of Appeals, Second Circuit.

Argued Oct. 4, 1993.

Decided Dec. 30, 1993.

Thomas S. Burka, Asst. Dist. Atty., Kings County, Brooklyn, NY (Charles J. Hynes, Dist. Atty., Kings County, Roseann B. Mac-Kechnie, Asst. Dist. Atty., of counsel), for respondent-appellant.

Richard Ware Levitt, New York City, for petitioner-appellee.

Before: MINER and ALTIMARI, Circuit Judges, and ELFVIN, District Judge.*

MINER, Circuit Judge:

Respondent-appellant, Superintendent of the Shawangunk Correctional Facility, appeals on behalf of the State of New York from a judgment entered in the United States District Court for the Eastern District of New York (Korman, *J.*) granting petitioner-appellee Robert Samuels' petition for a

*writ of habeas corpus. In that petition, Samuels challenged a November 15, 1982 judgment of the New York Supreme Court, Kings County, convicting him after a jury trial of fourteen counts of Robbery in the First Degree, in violation of New York Penal Law § 160.15 (McKinney 1988) and one count of Assault in the Second Degree, in violation of New York Penal Law·§ 120.05(2) (McKinney 1987) and sentencing him to concurrent prison terms of twelve to twenty-five years for seven of the robbery counts, eight and one-third. to twenty-five years for the remaining seven robbery counts and three to seven years for the assault count.

The district court found that the admission at Samuels' trial of oral, written and video-taped confessions made by nontestifying co-defendants, which were substantially similar to his own confession to the police, violated the Confrontation Clause under the Supreme Court's decision in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), and was not harmless error. Recently, in *Brecht v.· Abrahamson*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court announced that the proper standard for determining whether habeas relief must be granted based upon a constitutional error at trial is not whether the error was harmless beyond a reasonable doubt, but whether it " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at ——, 113 S.Ct. at 1714 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). We find that the district court erroneously applied this standard and accordingly reverse.

## BACKGROUND

### 1. The Robbery

At approximately 10:30 p.m. on May 28, 1982, Samuels, along with his codefendants in the state case, Robert Williams, Michael Williams, Bruce Garrison and James Martin, approached seven men inside the underground garage at the Patio Garden Apart-

---

* Honorable John T. Elfvin of the United States District Court for the Western District of New York, sitting by designation.

ments in Brooklyn, New York. Armed with pistols, they forced the victims to lie on the ground and remove their clothing, then proceeded to take jewelry and money from them. During the course of these events, one of the gunmen held a gun to Robert Tarver, one of the victims. Tarver later identified Samuels in a lineup as the man who had held the gun to him.

After robbing the victims, the robbers forced garage attendant Charles Cunningham to give them the keys to a black Cadillac parked in the garage. They then departed the scene in the stolen automobile. The next morning, police located and staked out the black Cadillac; eventually, they observed Samuels and several other men walking toward the automobile. When the police approached, Samuels fled, but he later was apprehended in an abandoned building close by. The other participants in the robbery ultimately were arrested as well.

Once in custody, each of the five participants made a statement to the police. At their joint trial, each of the defendants' confessions was admitted into evidence. The trial judge instructed the jury that it should consider each confession only against the defendant who had made it.

### 2. Samuels' Confession

Samuels, after being apprised of his *Miranda* rights, advised the police that he was willing to answer questions without an attorney being present. Samuels then made a statement to several detectives, which they recounted at the trial with the use of written notes they had taken contemporaneously with the statement. Samuels related the following: At about 10:30 p.m. on the night of the robbery, he was with "Mike" (Michael Williams) and "Buck" (James Martin) on Fountain Avenue in Brooklyn. The three were picked up by "Big Dick" (Robert Williams) and "Bee" (Bruce Garrison), who were driving in a 1971 or '72 green Cadillac. Together, the five men drove to an apartment building in downtown Brooklyn. Guns were distributed in the car. Once they arrived at their destination, Michael Williams got out of the car, went into the garage of the apartment building, looked around, and

returned to tell the others that it was "all right." While Michael Williams waited outside of the garage and Samuels and Martin waited in the car, Robert Williams and Garrison went into the garage for about twenty minutes and came out driving a new black Cadillac. They all entered the Cadillac and drove away.

Later that evening, according to Samuels, the five men dropped their guns off at the Albany Avenue projects and went to East New York to count up the money they had stolen. The money was given to Michael Williams to hold. Samuels and Michael Williams took a train to the home of Samuels' girlfriend, where they spent the night. The next morning, Samuels and Michael Williams met with the other defendants at a train station, and, after meeting, they all went to the black Cadillac, where they were approached by police.

### 3. James Martin's Confession

Codefendant Martin made a statement to Detective Paul Weidenbaum that was related to the jury through Weidenbaum's testimony. Martin told Weidenbaum that on the night of the robbery he met with Samuels, a "Robert Wales," Michael Williams and a "Ricky Jones." The five decided to "go out and stick up a few people" to make some money. When the five men drove to the garage, each of them was armed with various weapons—Samuels had a .38–caliber pistol. Martin said that it was Samuels and Michael Williams who went into the garage before the robbery, under the pretense that they were looking for directions. Next, Martin, Ricky Jones and Robert Wales entered the garage where they forced the victims to lie down and yield their valuables. Martin admitted that he forced the attendant to get the keys and start the Cadillac, at which time Samuels and Michael Williams reentered the garage. Together, the men left the garage in the stolen Cadillac and later divided the money at Martin's home. Martin stated that the next morning the men met to sell the property they had stolen the night before. Later, when the police converged as he walked toward the black Cadillac, he fled but was arrested later.

### 4. Robert Williams' Confession

Codefendant Robert Williams made a videotaped statement to Assistant District Attorney Martha Hochberger. In his confession, he stated that the five men drove to the Patio Gardens garage and parked outside. Each of the men was armed, Samuels with a .38-caliber handgun. Samuels and Michael Williams went into the garage to ask for directions. When they returned, they gave the signal to start the robbery. The five men entered the garage, robbed the occupants and left in the stolen Cadillac. Later, they left the Cadillac at Martin's house. The next morning, when the five men were in the vicinity of the Cadillac, the police arrived.

### 5. Bruce Garrison's Confession

Codefendant Garrison signed a written statement that he gave to Detective Robert Hayes. Detective Hayes read the statement to the jury at trial. In Garrison's version, Samuels and Martin entered the garage first, followed by the others. Garrison testified that he thought all five had guns except, perhaps, Michael Williams. Garrison admitted striking one of the victims with a gun and the garage attendant with a blackjack. Regarding the events of the next morning, Garrison stated that they all met to split up the money and later went to the black Cadillac.

### 6. Michael Williams' Confession

Codefendant Michael Williams gave an oral statement to police and two videotaped statements to Assistant District Attorney Martha Hochberger. In Michael Williams' version of the events, Robert Williams went into the garage first and, when he came out, told Michael Williams to wait outside to watch the front. The four other men, who Williams referred to as "Big Rob" Wells, "Little Rob," "Little Dick" and "Buck," went into the garage and committed the robbery. Michael Williams did not refer to Samuels by name or identify him as a participant in the robbery.

### 7. Additional Evidence Against Samuels

In addition to the confessions, the victims of the crime testified as to what had transpired during the robbery. The day after the robbery, Michael Tarver identified Samuels in a lineup as the man who had held a gun to him during the robbery. A photograph of this lineup was shown to the jury. Tarver, however, was unable to identify Samuels at trial and instead pointed to Robert Williams as the man he had identified in the lineup.[1] Finally, police officers Fehy and Colon testified that a man fitting Samuels' description was among a group of men walking toward the stolen Cadillac on the morning after the robbery, that they saw this man fleeing from the Cadillac and that Samuels was apprehended shortly thereafter wearing the same clothes as the man seen fleeing from the Cadillac.

### 8. Procedural History

After the jury rendered its guilty verdict, the Supreme Court, Kings County, entered a judgment of conviction and sentence. The Appellate Division, Second Department, affirmed the conviction, finding that Samuels' arrest was based on probable cause, his confession was not coerced, the lineup was not suggestive and Samuels was not prejudiced by the introduction of the statements of his codefendants. *People v. Samuels,* 109 A.D.2d 900, 486 N.Y.S.2d 791, 792 (2d Dep't 1985) (mem.). The New York Court of Appeals denied defendant's application for leave to appeal. *People v. Samuels,* 65 N.Y.2d 700, 491 N.Y.S.2d 1040, 481 N.E.2d 268 (1985) (Kaye, *J.*).

On June 28, 1989, Samuels filed a petition in the district court for a writ of habeas corpus. The district court granted the writ on April 26, 1993, finding that the introduction of the codefendants' statements violated the Confrontation Clause under the Supreme Court's decision in *Cruz,* which we have held to apply retroactively, *Graham v. Hoke,* 946 F.2d 982, 994 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992). The district court further found that, even though it was persuaded that the admissible evidence against Samuels probably

---

**1.** Samuels held his hands over his face when   Tarver was asked to identify him at the trial.

would have resulted in a conviction, the introduction of the codefendants' statements was not harmless error. This appeal followed.

## DISCUSSION

■ In *Cruz*, the Supreme Court held "that, where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." 481 U.S. at 193, 107 S.Ct. at 1719. This is so even if the codefendant's confession "interlocks"—is substantially identical to—the defendant's own confession. *Id.* at 191–93, 107 S.Ct. at 1717–19.

Prior to *Cruz*, under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), it was established that the Confrontation Clause barred the admission of a nontestifying codefendant's confession when the defendant had not himself confessed. *See id.* at 135–37, 88 S.Ct. at 1627–29. Several courts, however, applied an exception to *Bruton* allowing for the introduction of interlocking confessions of nontestifying codefendants on the assumption that, due to their interlocking nature, such confessions could be no more devastating to the defense than defendant's own confession. *See Graham*, 946 F.2d at 989 (citing cases). In *Cruz*, the Supreme Court eliminated this practice, finding that the interlocking nature of a codefendant's statement provides a corroborating effect that confirms the validity of the defendant's own confession; it is to avoid this corroborating effect that interlocking confessions must be excluded. *Cruz*, 481 U.S. at 193, 107 S.Ct. at 1719.

■ On this appeal, appellant does not contend that the admission of the codefendants' statements was not *Cruz* error. Rather, appellant first invites us to overrule our recent decision in *Graham* and hold that *Cruz* should not apply retroactively to Samuels' habeas petition. We must, of course, decline this invitation, since we will not overrule a prior decision of a panel of this Court absent a change in the law by higher authority or by way of an in banc proceeding of this

Court. *United States v. Moore*, 949 F.2d 68, 71 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1678, 118 L.Ed.2d 396 (1992). Appellant next argues that the admission of the codefendants' statements, even if it did violate *Cruz*, was harmless error. We agree with this contention.

In *Brecht*, the Supreme Court held that the rule of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), that an error involving a constitutional violation is harmless only if the prosecution establishes beyond a reasonable doubt that there was no reasonable possibility that the error contributed to the verdict, does not apply on the collateral review of state convictions. *Brecht*, —— U.S. at ——, 113 S.Ct. at 1713–14. The appropriate standard, the Court held, is whether "the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). This is the harmless error standard, first announced in *Kotteakos*, that federal courts apply to nonconstitutional trial errors. *See Brecht v. Abrahamson*, 944 F.2d 1363, 1374 (7th Cir. 1991), *aff'd*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). As applied on collateral review, "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, —— U.S. at ——, 113 S.Ct. at 1722 (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)).

■ "Violations of the *Cruz* rule are subject to harmless error analysis." *Graham*, 946 F.2d at 995; *see Cruz*, 481 U.S. at 194, 107 S.Ct. at 1719–20. A number of factors are, of course, relevant in determining whether a particular error is harmless. Of these factors, we have recognized that the weight of the prosecution's case against the defendant is the most significant. *See United States v. Colombo*, 909 F.2d 711, 714 (2d Cir.1990). In assessing the injurious effect of admitting a nontestifying codefendant's statement in violation of *Bruton* and *Cruz*,

we must also consider the nature and content of the defendant's own statement, in particular, "whether it satisfactorily explains his or her part in the crime without reference to the codefendant's statement." *People v. Hamlin*, 71 N.Y.2d 750, 530 N.Y.S.2d 74, 77, 525 N.E.2d 719, 723 (N.Y.1988); *see Graham*, 946 F.2d at 995 (three voluntary, comprehensive confessions by defendant led to finding of harmlessness); *Holland v. Scully*, 797 F.2d 57, 67 (2d Cir.) (no harmless error where defendant denied participating in robbery and admitted only after-the-fact involvement), *cert. denied*, 479 U.S. 870, 107 S.Ct. 237, 93 L.Ed.2d 162 (1986). Also relevant is the extent to which the defendant's statement is corroborated or contradicted by other objective evidence, *Hamlin*, 530 N.Y.S.2d at 77, 525 N.E.2d at 723; *Graham*, 946 F.2d at 996 (defendant's statement strongly corroborated by eyewitness testimony), and "whether [the] defendant has reiterated [his statement] on one or more subsequent occasions." *Hamlin*, 530 N.Y.2d at 77, 525 N.E.2d at 723; *see Graham*, 946 F.2d at 995 (defendant confessed at least three times). An attempt by the defendant to repudiate his own confession should also be considered, since the corroboration supplied by a similar codefendant statement may be particularly damaging in such circumstances. *Hamlin*, 530 N.Y.S.2d at 77, 525 N.E.2d at 723; *see Cruz*, 481 U.S. at 191–92, 107 S.Ct. at 1718–19. To be sure, these considerations are not exclusive, but they provide a useful starting point.

The weight of the evidence against Samuels, stripped of the *Cruz* error, is substantial. Based on the properly admitted evidence alone, we are in agreement with the district court that Samuels most likely would have been convicted. First, Samuels' statement established that he was a participant in the robbery. In his oral statement to the police, Samuels admitted that he was with the other defendants on the night of the robbery; that the group drove to the garage of an apartment building in downtown Brooklyn; that guns were given out in the car; and that he fled with the others in the stolen Cadillac. Samuels admitted that he was present when the defendants divided the stolen money and that he was present the next morning when

the group approached the stolen Cadillac. This latter admission was corroborated by the testimony of Officers Fehy and Colon that Samuels was seen approaching the stolen automobile the morning after the robbery.

■ Although Samuels contends that he remained outside the garage during the robbery, his admitted role probably was sufficient for the jury to convict him of the robbery as an accomplice. *See, e.g., People v. Miller*, 50 A.D.2d 872, 376 N.Y.S.2d 632, 633 (2d Dep't 1975) (defendant's presence at scene of crime, association with codefendants before and after offense and sharing of proceeds sufficient to sustain indictment for robbery). Indeed, Tarver's testimony, coupled with the evidence that he identified Samuels in a lineup, demonstrated that Samuels actually was inside the garage, playing the role of an armed, active participant in the robbery. While it is true that at the trial Tarver identified Robert Williams rather than Samuels as the man who held a gun to him, we do not believe that this destroyed the credibility of Tarver's lineup identification. In-court identifications inherently lack credibility, *see United States v. Lewis*, 565 F.2d 1248, 1251 (2d Cir.1977), *cert. denied*, 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978). Contemporaneous identifications, on the other hand, generally are given much more credence; indeed, such identifications are considered reliable enough to justify their exclusion from the hearsay rule, *see* Fed.R.Evid. 801(d)(1)(C); even when the witness is unable to repeat the identification in the courtroom, *see Lewis*, 565 F.2d at 1252. Thus, while Tarver's inability to identify Samuels at trial may have raised some question as to his perception, the jury certainly had reason to believe the contemporaneous identification of Samuels over the in-court identification of Robert Williams.

■ In order to find the *Cruz* error in this case to be harmless, we need not conclude that the evidence against Samuels was overwhelming. Indeed, in *Brecht*, the Court found the evidence of the petitioner's guilt to be "if not overwhelming, certainly weighty." —— U.S. at ——, 113 S.Ct. at

1722. In this case, the evidence against Samuels likewise can be characterized as "weighty," in view of the partially corroborated confession and the eyewitness testimony implicating Samuels in the robbery. We are mindful, however, not to give conclusive effect to our view of the evidence and that our ultimate task is to determine the impact the improperly admitted evidence had or reasonably may have had upon the minds of the jury. *Kotteakos,* 328 U.S. at 764, 66 S.Ct. at 1247–48. We thus turn our consideration to the other factors we listed above.

First, the evidence that Samuels played an active role in the robbery is comprehensively shown without reference to the codefendants' statements. While Samuels attempted to downplay his role in the robbery, Tarver's testimony and the evidence of the lineup identification indicate that Samuels was inside the garage and had performed overt acts in furtherance of the robbery by holding a gun to Tarver. Although the codefendants' statements also place Samuels inside the garage, none of them indicates any overt acts that Samuels took while inside the garage and thus largely were cumulative in view of the other evidence.

Next, as we have noted, Samuels' statement was corroborated in part by the testimony of Officers Fehy and Colon, which placed him in the vicinity of the stolen Cadillac the morning after the robbery; it was contradicted in part by the testimony of Tarver and the evidence of Tarver's lineup identification of Samuels. We note also that Samuels' statement was an oral one, which was not repeated. It cannot be gainsaid that the codefendants' statements corroborate Samuels' involvement in the robbery and that they therefore may have had some effect in the jury's mind. But to conclude that the error was harmless in a case of this kind, we need not find that the improperly admitted evidence had no effect at all, *see United States v. Rea,* 958 F.2d 1206, 1220 (2d Cir. 1992)—we need only find that the effect was not "substantial and injurious." On the whole, we cannot say that the effect of the improperly admitted evidence here was so injurious as to result in the sort of prejudice envisioned by *Kotteakos* and *Brecht.*

Finally, Samuels makes much of his attempts at trial to downplay his confession. At the trial, Samuels' counsel argued in summation that, because Samuels had refused to make a videotaped statement after his oral statement to police, he perhaps did not make the oral statement at all. Counsel further suggested that the detectives, after hearing so many statements by the defendants, "commingled" the statements of each when recording the statements and that the police version of Samuels' statement somehow was inaccurate. We do not believe that these arguments by counsel, standing alone, would have cast significant doubt in the jurors' minds as to whether Samuels actually confessed or as to the contents of his confession, even absent the corroborating statements of the other defendants. Accordingly, the corroborating effect of the codefendants' statements was not so injurious that Samuels suffered actual prejudice by their admission. *Cf. Cruz,* 481 U.S. at 192, 107 S.Ct. at 1718–19.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and the habeas corpus petition is dismissed.