**Richard HIDALGO, Petitioner,**

v.

**Robert KUHLMAN, Superintendent, Sullivan Correctional Facility, Respondent.**

**No. 94 CV 2809.**

United States District Court, E.D. New York.

Jan. 27, 1997.

### OPINION AND ORDER

GERSHON, District Judge:

Petitioner Richard Hidalgo seeks habeas corpus relief under 28 U.S.C. § 2254 from a conviction of one count of murder in the second degree (N.Y. Penal Law § 125.25[3]) and two counts of assault in the second degree (N.Y. Penal Law § 120.05[6]) entered by the New York State Supreme Court, Kings County, on January 19, 1979. Petitioner was sentenced to serve an indeterminate term of twenty years to life on the murder count and an indeterminate sentence with a maximum term of seven years on each of the assault counts, all sentences to run concurrently. Petitioner's sole contention before this court is that the admission at trial of the statements of his two co-defendants, Robert Morales and Ventura Rodriguez, who were tried with Petitioner and who did not testify at the trial, violated his rights under the Sixth Amendment's Confrontation Clause.

### PROCEDURAL HISTORY

Petitioner appealed his conviction to the Appellate Division, Second Department. At that time, counsel for Petitioner failed to

argue that the admission of the statements of Petitioner's co-defendants violated Petitioner's constitutional rights.[1]  On March 30, 1981, the Appellate Division affirmed Petitioner's conviction without opinion. *People v. Hidalgo,* 80 A.D.2d 1001, 438 N.Y.S.2d 665 (2d Dep't 1981).  Leave to appeal to the New York Court of Appeals was denied on May 29, 1981.

On December 15, 1987, Petitioner filed a petition for a writ of error *coram nobis* with the Appellate Division, claiming that his appellate counsel was ineffective for failing to argue that the admission of incriminating statements by Petitioner's co-defendants constituted constitutional error.  On June 10, 1988, the Appellate Division denied the petition.

Petitioner then filed a motion to vacate his sentence pursuant to New York Criminal Procedure Law § 440.10, arguing that the admission of his co-defendants' statements violated his rights under the Confrontation Clause.  The motion was denied without a hearing in November, 1988, and leave to appeal was denied.

█  "In the interest of comity and in keeping with the requirements of 28 U.S.C. § 2254(b) (1994), federal courts will not consider a constitutional challenge that has not first been 'fairly presented' to the state courts." *Ayala v. Speckard,* 89 F.3d 91, 94 (2d Cir.1996).  Here, it is clear that Petitioner presented the factual allegations and constitutional legal doctrine underlying his Confrontation Clause claim to the state courts. *See Daye v. Attorney General of the State of New York,* 696 F.2d 186 (2d Cir.1982).  Ac-

cordingly, Petitioner's claim has been exhausted.[2]

### SUMMARY OF EVIDENCE AT TRIAL

#### A.  The People's Case

##### 1.  Key Witnesses

In the early morning hours of November 15, 1977, the apartment building complex at 247 Grove Street, home of brothers Stanley and Avon Green, burned to the ground, killing an eight-year-old child and injuring other residents of the building.  In connection with that fire, Petitioner and his co-defendants were charged with murder in the second degree, two counts of assault in the second degree, arson in the second degree, reckless endangerment in the first degree, and criminal possession of a weapon in the third degree.  Neither Petitioner nor his co-defendants moved for a severance.

At the trial, the prosecution presented the following evidence linking Petitioner to the fire:  Darryl Jones testified that approximately two weeks before the fire, he, Petitioner, Morales, Stanley Green, Avon Green, and "a couple of other Puerto Ricans" took pipes from an abandoned building near 247 Grove Street and hid them in the basement at 247 Grove Street with the intention of later selling the pipes.  The following day, according to Jones, Petitioner and his co-defendants had an altercation with the Green brothers and others, in part over the division of the proceeds from the sale of the pipes.  During that dispute, Petitioner and the co-defendants threatened to burn down the Greens' building the following week.[3]

---

1.  Instead, Petitioner's counsel contended that (1) Petitioner's guilt had not been established beyond a reasonable doubt; (2) "inflammatory" evidence was improperly admitted at trial; (3) the trial court failed to properly charge the jury that it should evaluate the evidence separately with regard to Petitioner and his co-defendants; and (4) Petitioner's sentence was excessive.

2.  Although Petitioner's Confrontation Clause claim—which is independent of, though related to, his ineffective assistance of counsel claim—was not raised on direct appeal, it is not procedurally barred.  "[P]rocedural default in the state court will only bar federal habeas review when 'the last state court rendering a judgment in the case clearly and expressly states that its

judgment rests on a state procedural bar.' " *Glenn v. Bartlett,* 98 F.3d 721 (2d Cir.1996) (quoting *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)).  In this case, the order of the trial court denying Petitioner's motion to vacate the judgment provides no grounds for the denial.  Accordingly, federal habeas review of Petitioner's Confrontation Clause argument is not barred on procedural default grounds.

3.  Jones testified that the threat was made by Petitioner and both co-defendants:

A.  Then they just walked away talking about they are going to burn down the house.

Q.  Who said that?

Both Stanley and Avon Green likewise testified that approximately one week before the fire, they were involved in an argument with Petitioner, his co-defendants, and "other Puerto Ricans" during which one or more of the defendants threatened to burn down the Greens' building. Stanley Green attributed the threat generally to Petitioner and Rodriguez; Avon Green attributed it to Morales.

Francisco Salaman, a young teenager, testified that in the early morning of November 15, 1977, he saw Petitioner, the co-defendants, and one other man on a street corner near Grove Street. Salaman stated that he overheard Petitioner say, "[T]he niggers on Grove owe me one, and they're going to pay." The group of four then walked toward Grove Street, and Salaman followed them. According to Salaman's testimony, Petitioner and Morales approached an apartment building on Grove, while Rodriguez and the other participant stood lookout at the corner of the block. Petitioner then took out a coke bottle with yellow liquid inside and a rag on top, lit the rag on fire, and threw the lit bottle into the apartment building through the building's front door, which Morales held open.

Salaman testified that, within seconds after Petitioner threw the bottle, the first floor of the apartment building caught fire. Petitioner and his companions fled, and Salaman set off the fire alarm on the corner of the block. When the fire fighters and police officers arrived at the building, Salaman informed New York City Police Detective Jerry Magliolo that he knew the names of the people who started the fire. On direct examination, Salaman conceded that, after cooperating with the police, and before the trial, he had told both Rodriguez's father and Rodriguez's lawyer that he had lied to the police. At trial, he maintained that he claimed to have lied because a "couple of [the defendants'] boys" had threatened him.

The prosecution also called Magliolo, who confirmed that Salaman had approached him on the morning of the fire and that Salaman later played a role in the police investigation

of the fire. Moreover, New York City Fire Marshall Thomas Sullivan, who investigated the fire in question, testified at trial as an expert on fire science. After examining 247 Grove Street on the morning after the fire, Sullivan concluded that the fire started in a flammable liquid on the first floor hallway of the building.

### 2. The Co-Defendants' Statements and Petitioner's Statement

Both co-defendants, as well as Petitioner, were questioned about their roles in the fire by a police detective or an assistant district attorney. The statements that resulted, as they were revealed at trial, are detailed below.

#### a. Morales's Statement

On November 23, 1977, co-defendant Morales was questioned by Assistant District Attorney Daniel Friedman. Friedman read Morales his rights, and Morales agreed to make a statement without an attorney present. In his statement, which was transcribed by a stenographer and then read into the trial record by Friedman, Morales repeatedly denied any involvement in the fire. Morales admitted knowing Petitioner, but stated that he did not know whether Petitioner or Rodriguez had anything to do with the fire. When asked whether he had "any hint on who might have started the fire," he responded, "No, so help me God I don't know nothing about that." Morales also denied the occurrence of a fight between the defendants and the Green brothers over money related to the stolen pipes the week before the fire.

#### b. Rodriguez's Statement

Co-defendant Rodriguez was questioned by Detective Magliolo on November 15, 1977. Magliolo read Rodriguez his rights, and Rodriguez agreed to speak to him without an attorney present. The following is the portion of Magliolo's testimony which describes his conversation with Rodriguez:

A. [Petitioner] and [Morales].
Q. Anybody else said that?
A. [Rodriguez]. He was walking, but I didn't hear him say it, though.
Q. And what did they say?

A. They are going to burn down the house if they don't get their cooler and stuff.
Q. Did they say when that was going to take place?
A. In about a week's time.

A. I asked Mr. Rodriguez where he was the night before.

Q. What date would that be?

A. That would be the morning of November 15, 1977. He said he was in the street up until 10, 10:30, or maybe as late as 11 o'clock that night. He went home. He stood [sic] home all night. He woke up in the morning, early that morning. I asked him if he had any knowledge of a fire at 247 Grove Street. He said no, he did not. I asked Mr. Rodriguez if he recalled an argument a week or two prior to this fire involving himself, one Poison,[4] ... and Rice, which had occurred with a black family residing at 247 Grove Street. He told me, yes, he was at the argument, but he was removed from the scene.... He told me that the argument was that there was a ripoff group that was stealing the pipes from the vacant buildings, that the argument ensued, and that Poison wanted his cooler back, and an additional $2 for being the lookout while these robberies were committed....

Q. Did you ask Mr. Rodriguez anything else?

A. Yes, I did. I asked him that during the course of this argument did he hear anyone threaten to burn down the house of the black people. He said he heard someone say that they were going to burn down the house, but he did not know who said that. I further asked if he observed someone with a gun. He told me that yes, someone had a gun, but he did not know which of the three had a gun.

### c. *Petitioner's Statement*

Detective Magliolo questioned Petitioner on November 19, 1977. According to Magliolo's testimony at trial, he read Petitioner his rights and then had the following conversation:

I asked Mr. Hidalgo if he had any information concerning the fire at 247 Grove Street. He replied that he didn't. I asked him about an incident a week or two prior when an argument ensued between himself, Rice [sic] and Jay with a black family at 247 Grove Street. He said, yes, he was present at the argument. He recalls that there was an argument. It was over pipes that were being removed, and that someone was demanding $2, but he was not sure who it was. I asked Mr. Hidalgo if he heard anyone say that they were going to burn down the building. He said no, the only thing he heard was that the black family was going to be dispossessed. I asked him if he observed anyone with a revolver. He said no, he did not, and that was the substance of the conversation.

### 3. *The Prosecution's Summation*

On summation, the prosecutor gave an extensive review of the testimony of Darryl Jones, Avon and Stanley Green, Francisco Salaman, and Detective Magliolo. The prosecutor also made various references to the defendants' statements. He stated that each defendant acknowledged an agreement to steal pipes in the abandoned building in the neighborhood, sell the pipes, and divide the proceeds. The prosecutor also argued that each defendant admitted that there was an argument between the Green brothers and the defendants; and he discussed the defendants' description of that argument.[5]

### B. *Petitioner's Defense*

Petitioner rested without having called any witnesses. However, co-defendant Morales called Frankie Garcia. Garcia, a young teenager, testified that on November 15, 1977, he and a friend were picked up by Detective Magliolo on their way to school and brought to the precinct, where they remained for six to eight hours and where they were questioned by Detective Magliolo regarding the Grove Street fire. Garcia stated that Magliolo frightened him by banging on a table

---

4. At the trial, Morales was referred to as "Poison," Petitioner as "Rice," and Rodriguez as "Little Jay."

5. Although the transcript of the final pages of the prosecution's summation is missing and it is therefore possible that the prosecution made other references to the statements than are described in the text, for the reasons detailed below, I am satisfied that, even if it did, the admission of the statements constituted harmless error.

and by threatening to "send [him] with the fire marshal so they could lock [him] up" if he did not provide the statements regarding the fire that Magliolo wanted. At trial, Garcia insisted that he knew nothing about the fire; and he recanted his prior, sworn statements implicating the defendants in the setting of the Grove Street fire. He maintained at trial that those statements had resulted from his fear of Magliolo, who had told him what to say and threatened to imprison him if his statements proved unsatisfactory.

Garcia's sister, Mini Ayers, was called by co-defendant Rodriguez. She testified that Garcia had informed her that the police had not treated him properly when they interrogated him. She also stated that, after testifying before the grand jury, Garcia told her that Magliolo had dictated to him everything that he was to say.

On summation, Petitioner's attorney focused on discrediting Salaman, whom he called "the People's star witness." He pointed to alleged flaws in Salaman's testimony, critiqued his demeanor on the stand, and evaluated his motivations for lying. Petitioner's attorney also criticized Detective Magliolo's interaction with Garcia, calling it "as classic a case of undue influence as ever has been divulged in this County." Petitioner's counsel made no mention of the admission of the defendants' statements.

## *ANALYSIS*

### A. *Constitutional Error*

The Supreme Court has held that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant,[6] and even if the defendant's own confession is admitted against him." *Cruz v. New York,* 481 U.S. 186, 193, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987) (internal citations omitted). A co-defendant's statement is inadmissible against the defendant even if it is substantially identical to the defendant's own confession. *See Samuels v. Mann,* 13 F.3d 522, 526 (2d Cir.

1993) (citing *Cruz,* 481 U.S. at 193, 107 S.Ct. at 1719), *cert. denied,* 513 U.S. 849, 115 S.Ct. 145, 130 L.Ed.2d 85 (1994). The Court of Appeals for the Second Circuit has held that the *Cruz* decision should be applied retroactively. *See Graham v. Hoke,* 946 F.2d 982, 994 (2d Cir.1991), *cert. denied,* 502 U.S. 1039, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992).

As trial error, violations of the *Cruz* rule are subject to harmless error analysis. *Samuels,* 13 F.3d at 526 (discussing *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). In that regard, conclusive effect is not to be given to the reviewing court's view of the evidence, but rather to "the impact that the improperly admitted evidence had or reasonably may have had upon the minds of the jury." *Id.* at 528. To conclude that a *Cruz* error is harmless, it need not be found that the improperly admitted evidence had no effect at all in the jury's mind; it need only be found that the effect on the determination of the jury's verdict was not substantial and injurious. *Id.; see Latine v. Mann,* 25 F.3d 1162, 1167 (2d Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1319, 131 L.Ed.2d 200 (1995).

The factors relevant to the determination of whether an error is harmless include "the importance of the . . . testimony in the prosecution's case, whether the testimony was cumulative, the absence or presence of evidence corroborating or contradicting the testimony, and the overall strength of the prosecution's case." *Latine,* 25 F.3d at 1167–68. "[I]n cases in which the government demonstrates that the other, properly admitted evidence sufficiently proves the elements of the crime for which the defendant was convicted, and there is no reasonable probability that the [Confrontation Clause] violation infected the verdict, [this circuit has] affirmed the conviction despite the confrontation clause violation." *United States v. Kyles,* 40 F.3d 519, 527 (2d Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1419, 131 L.Ed.2d 302 (1995). For a Confrontation Clause error to be found harmless, the evidence against petitioner need not have been overwhelming; it need

---

**6.** In this case, the trial judge instructed the jury that "a statement made by one defendant may

only be considered by you with respect to the defendant who made that statement."

only have been "weighty." *See Samuels*, 13 F.3d at 527–28.

## B. *Petitioner's Claim*

The State does not dispute Petitioner's contention that his right to cross-examine his accusers was violated when Detective Magliolo and Assistant District Attorney Friedman testified to the statements of Rodriguez and Morales, but argues that the admission of the statements constituted harmless error. I agree.

■ Considering, first, Morales's statement, the only material in the statement which can be said to implicate Petitioner is Morales's acknowledgment that he knows Petitioner. Aside from that comment, Morales merely denied, first, that he knew anything at all about the cause of the fire and, second, that there had been a dispute with the Green brothers the week before the fire. Thus, Morales's statement at best provides cumulative evidence for the fact that Petitioner and Morales knew one another—a fact that has little if any probative value in the determination of whether Petitioner committed the charged crimes, and a fact that was established by the testimony of at least four other witnesses. Therefore, Morales's statement cannot be said to have had "substantial and injurious effect or influence in determining the jury's verdict," *Samuels*, 13 F.3d at 526 (internal quotations omitted); and its admission constituted harmless error.

■ Like Morales's statement, Rodriguez's statement does not directly implicate Petitioner in the charged crimes: Rodriguez simply stated that he knew nothing about the fire. Nonetheless, Rodriguez's statement is more damaging than Morales's statement, as it places Petitioner at the argument with the Green brothers one week before the fire. It also confirms that someone, during the course of that argument, threatened to burn down the apartment building.

However, the admission of this statement was also harmless error, as Petitioner's presence at the argument was well established by the admissible testimony of multiple prosecu-

tion witnesses. Darryl Jones, Stanley Green, and Avon Green each testified that Petitioner was involved in the dispute with the Green brothers and that someone during that dispute threatened to burn down the Greens' apartment building. Moreover, Petitioner himself, in his statement which was admitted at trial—and which he never repudiated, *cf. Samuels*, 13 F.3d at 528—acknowledged that he was present at the dispute with the Greens, although he denied that anyone threatened at that time to burn the building. Even though, under *Cruz*, Rodriguez's statement is not rendered admissible by the fact that it interlocks to a certain extent with Petitioner's account, the content of Petitioner's declaration is relevant to assessing the injurious effect of admitting Rodriguez's statement. *See Samuels*, 13 F.3d at 526–27.

Neither of the co-defendant statements in this case inculpate Petitioner directly in the crime charged, and there is no possibility that the statements standing alone would have been enough to support Petitioner's conviction. Indeed, the heart of Petitioner's defense at trial and on appeal was the discrediting of the testimony of Francisco Salaman, who, as Petitioner's counsel on direct appeal noted, "was the only witness to testify about the charged crimes. Without his evidence, there was no proof of anyone's guilt." The prosecution also acknowledged on direct appeal that "[t]he key issue in this case is whether Francisco Salaman was telling the truth." Salaman was extensively cross-examined by counsel for the three defendants, and their summations highlighted every possible discrepancy between Salaman's testimony and the other testimony at trial. The jury had every opportunity to evaluate Salaman's credibility; and, as acknowledged by both the defense and the prosecution, it was on that evaluation that Petitioner's conviction turned. That pivotal evaluation could not have been skewed against Petitioner as a result of the admission of the co-defendants' statements, as both co-defendants denied any involvement in the fire, thereby contradicting Salaman's testimony.[7]

---

7. I note that, although it is not recorded in the trial transcript, according to defendant's brief to

the Appellate Division, shortly after they began their deliberations, the jury requested the "pre-

52

All in all, I am persuaded that "the other, properly admitted evidence sufficiently proves the elements of the crime for which the defendant was convicted, and there is no reasonable probability that the [Confrontation Clause] violation infected the verdict...." *United States v. Kyles,* 40 F.3d at 527. The incriminating material in the co-defendants' statements merely restates a fact to which three of the prosecution's principal witnesses testified; and the statements do not directly implicate Petitioner in the crime that is charged. Accordingly, their admission must be deemed harmless error.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is hereby denied.

**SO ORDERED.**

trial statements of three defendants that were not read to the jury during trial." The record does not indicate what response, if any, was made to that request. Accepting the jury's interest in the statements as of some significance, the fact remains that the statements did not directly implicate Petitioner and were insufficient to convict him. In light of the other evidence against him, which was treated as central by both prosecution and defense, the jury's request does not alter my view that the admission of the statements was harmless error.