**Robert RYAN, Petitioner,**

v.

**Louis MANN, Superintendent, Shawangunk Correctional Facility, Respondent.**

**No. 93–CV–4435 (ARR).**

United States District Court, E.D. New York.

Nov. 12, 1998.

Vivian Shevitz, Mt. Kisco, NY, for petitioner.

Marcia R. Lombardo, Suffolk County District Attorney's Office, Riverhead, NY, for respondent.

## OPINION AND ORDER

ROSS, District Judge.

Petitioner Robert Ryan was tried by a jury and convicted of Robbery in the First Degree. On November 10, 1986, Ryan was sentenced to a term of imprisonment of twelve and one-half (12 ½) to twenty-five (25) years. Pursuant to 28 U.S.C. § 2254, Ryan now brings this petition for a writ of *habeas corpus* challenging his conviction.

For the reasons set forth below, the petition is denied.

## I. Factual and Procedural Background

On Sunday, March 16, 1986, two men robbed the Triplex movie theater in Islip, Long Island. Eyewitnesses subsequently identified the petitioner's codefendant Musmacher as one of the perpetrators. When the police arrested Musmacher, he apparently denied participating in the robbery and incriminated the petitioner, who he said had committed the robbery while wearing the maroon leather jacket in which Musmacher was arrested. *See* Pet. Memo. at 6; Hear. Trans, Sept. 22–23, 1986, at 55–56. Apparently acting upon the codefendant's tip and subsequent positive identifications of the petitioner by eyewitnesses, the police arrested petitioner. *See* Tr. Trans. at 470–75. Before trial, petitioner made a motion to sever his trial from that of Musmacher. *See* Hear. Trans. at Sept. 25, 1986, at 64 That motion was denied after the prosecution agreed not to introduce Musmacher's statement unless Musmacher testified.[1] *See id.;* Tr. Trans. at 635. A motion to suppress the out-of-court identifications and preclude in-court identifications as the product of impermissibly suggestive identification procedures was denied. *See* Hear. Trans., Sept. 25, 1986, at 63–64.

On September 29, 1986, a jury trial of petitioner and codefendant Musmacher was commenced in Suffolk County Court. The following evidence was established at trial. As Eric Collins, the Triplex assistant manager, locked the outside doors of the theater at approximately 11:05 p.m. after the end of the last screening, two men approached him and stated that their fifteen year-old sister remained inside. *See* Tr. Trans. at 61–62, 70–71. After a brief conversation, Collins and Michael Norton, a Triplex usher, unsuccessfully

---

1. At trial, the prosecutor maintained that he had only agreed not to use Musmacher's statement in his direct case. *See* Tr. Trans. at 635–36. However, as the court determines that admission of the statement was a *Bruton* violation, the evidence was inadmissible under any circumstance and the exact nature of the agreement is immaterial.

searched the theaters and bathrooms for the missing girl. *See id.* at 70–71, 260–61. When Norton and Collins returned to the lobby, one of the two men, who had entered the theater, pulled out a gun and demanded the theater's money. *See id.* at 74, 263. The two men forced Collins and Norton at gunpoint into the theater's office, where they compelled Norton to lie on the floor and Collins to open the safe. *See id.* at 83–84. At that point, the two men emptied the safe, tore the office telephone from the wall, and forced Collins to lie on the floor. *See id.* at 86–88. After warning Collins and Norton to stay down or they would be shot, the two men left the theater. *See id.* at 90.

Approximately five minutes elapsed during the entire burglary. *See id.* at 118, 270. The men stole over three thousand dollars, including about two hundred dollars in rolled quarters. *See id.* at 85–86. After the two men had left the area, Collins and Norton asked two youths in the parking lot to run to the fire station and alert the police officer usually stationed there to the robbery. *See id.* at 101. The police arrived at the scene soon thereafter. *See id.*

Both Collins and Norton provided detailed descriptions of the robbers at trial. While the descriptions differed from each other in some details, they were largely consistent.[2] Both Norton and Collins made positive, courtroom identifications of both defendants. *See id.* at 81, 83, 268. Both Collins and Norton testified that they were able to look carefully at both defendants' faces under excellent lighting conditions for substantial periods of time.[3] *See id.* at 77–78, 261–63. Defense counsel did highlight some inconsistencies between Collins's and Norton's descriptions to the police on the night of the robbery and their descriptions at trial, most notably Collins's initial description of the robber identified as Ryan as 5 foot 10 inches tall. *See id.* at 146–47.

In addition to the two identifying witnesses, the government offered testimony from a theater patron, who saw two men of similar, though by no means identical, description to the defendants loitering outside the theater prior to the robbery and running from the theater after the robbery, *see id.* at 363–68, a taxi driver who picked up a man of similar, but by no means identical, description to the petitioner from the same street where the codefendant resided at 3:00 am on the night of the robbery, *see id.* at 442–45, and the theater projectionist, who saw the robbery taking place in the office through a crack in the door at the time described by the eyewitnesses.[4] *See id.* at 388–89. However, none of these witnesses could positively

---

2. Both Collins and Norton described the robber with the gun, later identified as Musmacher, as a slight white male, 5 foot 7 (Collins) or 8 (Norton) inches tall, with shoulder-length, light-colored, curly hair and a moustache, and wearing a bandana. *See* Tr. Trans. at 78, 264. The two differed as to the shade of Musmacher's hair, sandy (Collins) as opposed to dirty blond (Norton), and the color of the bandana, blue or black (Collins) as opposed to red (Norton), *Compare id.* at 78 *with id.* at 264; *id.* at 116–17 *with* 264. Both Collins and Norton described the other robber, later identified as the petitioner, as a white male, approximately 5 foot 7, with curly black hair and a black mustache, wearing dark "Trans Am" glasses. *See id.* at 81–82, 264. Both witnesses describe the robber identified as petitioner as wearing a dark jacket. *See id.* at 114, 264.

3. Indeed, though the robber identified as codefendant Musmacher at times wore the bandana over his face, both identifying witnesses testified that they saw his face uncovered for a substantial time during the robbery. *See* Tr. Trans. at 78, 263. Similarly, though the robber identified as petitioner Ryan wore glasses, Collins testified that he saw him as he left the theater without the glasses. *See id.* at 82.

4. The projectionist described the one robber he saw to the police as wearing a ski mask, *see* Tr. Trans. at 390–91, though at trial he described the robber as wearing a bandana. *See id.* The defense highlighted this inconsistency throughout the trial. *See, e.g., id.* at 408–11.

identify either of the defendants at trial. *See id.* at 374–75, 416, 444.

As its final witness, the government called an investigating officer, Detective Anthony Laghezza, to testify regarding the circumstances of the arrest of codefendant Musmacher. In particular, Detective Laghezza revealed that, during the arrest, he and Detective Gerald P. Fanning removed a maroon leather jacket containing seven rolls of quarters in the jacket pocket from the codefendant's person. *See id.* at 468–69. A previous witness, theater owner Michael Westley, had identified the rolls of quarters as identical in appearance to the rolls stolen from the theater, though he admitted that all rolls of quarters obtained from the theater's bank might look the same. *See id.* at 238, 244–45. Detective Laghezza also testified that, subsequent to Musmacher's arrest, Ryan became a suspect. *See id.* at 474–76. The prosecution then rested its case.

The first witness called by codefendant Musmacher was Detective Fanning. Upon cross-examination by petitioner's counsel, Detective Fanning was asked why he seized the jacket from Musmacher upon arrest. The following colloquy took place:

Fanning ("F"): Because I had knowledge that it was worn by one of the participants in the robbery.

Counsel ("C"): Was it worn by Musmacher?

F: No.

C: Was it worn by Ryan?

F: Yes.

*Id.* at 529. Petitioner's counsel then induced Fanning to admit that the coat was a woman's coat. *See id.* at 531.

On cross examination by the prosecution, the following colloquy took place:

ADA Collins: Did you have any additional information that led you to believe that Ryan was wearing the leather coat at the time of the robbery?

F: Musmacher told me.

*Id.* at 532. At this point, codefendant's counsel made a motion to strike the question and answer and both codefendant's and petitioner's counsel made motions for a mistrial. All of the motions were denied. *See id.* at 532–538. On recross examination, petitioner's counsel and Detective Fanning engaged in the following exchange:

C: That's the jacket you think Ryan was wearing when he was supposed to have pulled the job?

F: Can I answer the question?

Court: Yes.

F: That's the jacket Musmacher told me that he was wearing.

*Id.* at 539–40. Upon a question from petitioner's counsel, Detective Fanning admitted he had not tape-recorded the conversation with Musmacher, *see id.* at 540, though on re-cross, the government established that Fanning recorded the contents of the conversation in a written report. *See id.* at 542.

On the next day of testimony, after a weekend recess, the court informed the parties that it had made a mistake in admitting testimony regarding defendant Musmacher's statements incriminating the petitioner. As a result, the court issued a curative instruction to the jury, instructing them that "during the course of cross-examination of the witness, Detective Fanning, a question was asked, 'Did you have any additional information that led you to believe that Ryan was wearing a leather coat at the time of the robbery?' by Mr. Collins, the Assistant District Attorney. Upon reconsideration, I determined that that question was objectionable, and any answer concerning that is not part of the competent evidence in the case and should not be considered by you for any purpose." *Id.* at 641. Moreover, during the jury charge, the court further instructed the jury that it "is to disregard any reference made during the testimony of Detective Fanning as to anything that the defendant Musmacher may or may not have said." *Id.* at 775.

Both defendants introduced alibi evidence. However, the petitioner's alibi witness, Steve Tortomas, appeared to testify at one point that he was with petitioner between 8:30 p.m. and 9:00 p.m. and then again after midnight and at another point that he was with the petitioner continuously between 8:30 p.m. and after midnight. *See id.* at 585, 589–90. As a result, in his closing statement, petitioner's counsel acknowledged that Tortomas had contradicted himself. *See id.* at 685. In the government's closing, ADA Collins reiterated that Ryan became a suspect after the arrest of Musmacher and described the maroon leather jacket as "the jacket to which (sic) has been much referral." *See id.* at 723–25.

On November 10, 1986, after requesting and receiving read-backs of the testimony of Tortomas, the taxi driver, a witness related to the codefendant's alibi, and Detectives Laghezza and Fanning,[5] the jury convicted the petitioner of Robbery in the First Degree. *See id.* at 790. Petitioner was sentenced to a term of imprisonment of twelve and a half (12½) to twenty-five (25) years. *See* Sent. Hear. at 8. In his direct appeal to the Appellate Division, petitioner contended that (1) the admission of codefendant Musmacher's statement violated his rights to a fair trial under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), (2) the pretrial photographic identification procedures were impermissibly suggestive and tainted the in-court identifications, (3) the testimony of Detective Leghezza that he arrested petitioner after conferring with eyewitnesses constituted impermissible bolstering, (4) the prosecutor's prejudicial comments during summation deprived petitioner of a fair trial, and (5) the sentence was excessively harsh. *See* Resp.Memo., Exh. A.

The Appellate Division held the pretrial identification procedures to be impermissibly suggestive. *See People v. Ryan*, 147 A.D.2d 508, 509, 537 N.Y.S.2d 315 (2d Dept.1989). As a result, the court held petitioner's appeal in abeyance pending a county court hearing to determine whether the testifying witnesses had a source independent of the impermissibly suggestive procedures to support their in-court identifications. *See id.* After the County Court of Suffolk County held that the identifying witnesses did have an independent source for their in-court identifications, the Appellate Division upheld the conviction, holding the in-court identifications admissible, the admission of evidence regarding the impermissibly suggestive out-of-court identifications harmless error, and the remaining contentions "either unpreserved for appellate review or without merit." *People v. Ryan*, 166 A.D.2d 619, 619–20, 560 N.Y.S.2d 903 (2d Dept.1990). The petitioner's application to the Court of Appeals for leave to appeal was subsequently denied, as was the petitioner's subsequent motion to reargue his request for leave to appeal. *See People v. Ryan*, 77 N.Y.2d 1000, 571 N.Y.S.2d 926, 575 N.E.2d 412 (1991); *People v. Ryan*, 78 N.Y.2d 973, 574 N.Y.S.2d 953, 580 N.E.2d 425 (1991).

Petitioner next moved the County Court, Suffolk County to vacate the conviction pursuant to CPL § 440.10 on the grounds that the decision of the Court of Appeals in *People v. Burts*, 78 N.Y.2d 20, 571 N.Y.S.2d 418, 574 N.E.2d 1024 (1991) (holding that convictions based on in-court identifications subsequent to impermissibly suggestive identification procedures without proof of independent source must be reversed rather than held in abeyance), should be applied retroactively to petitioner's case. *See* Resp.Memo., Exh. H. The County Court rejected petitioner's 440 motion on January 15, 1993. *See* Resp.

---

**5.** The petitioner has not argued that the read-back of Detective Fanning's testimony included a read-back of the erroneously admitted testimony regarding the statement of codefendant Musmacher inculpating the petition-er. Since the court had previously decided to grant the motion to strike the offending testimony, *see* Tr. Trans. at 614, this court can only assume that the offending testimony was not read back to the jury.

Memo., Exh. J. Petitioner's application for leave to appeal the denial of his 440 motion was rejected.

On September 21, 1993, petitioner filed a *habeas corpus* petition with this court. *See* Orig. Pet. However, upon obtaining the services of a new attorney, petitioner requested and obtained an order from this court holding his petition in abeyance pending the exhaustion of state court remedies. *See* Order, Oct. 18, 1995. Petitioner then submitted a second 440 application to the County Court, Suffolk County to vacate the conviction, arguing that his trial counsel rendered him ineffective assistance. *See* Resp.Memo., Exh. O. However, the County Court denied the application on two procedural grounds. First, the County Court held the 440 application procedurally barred because "[i]n this case, where the factors [of ineffective assistance] all appear on the record, both the statute and its underlying logic requires (sic) that the issue be raised on appeal and not in a 440 application." *People v. Ryan*, No. 682–86, at 3 (Suffolk Cty. Ct. Sept. 26, 1996) (citing CPL 440.10(2)(c)), *available in* Resp.Memo., Exh. Q. Second, the County Court exercised its procedural discretion to deny the petitioner's 440 application as successive, holding that "the defendant was in a position to raise the issue on a prior 440 application but did not do so." *Id.* at 4 (citing 440.10(3)(c)). The Appellate Division denied petitioner's request for leave to appeal the County Court's decision. *See People v. Ryan*, No. 96–9288 (2d Dept. Nov. 13, 1996), *available in* Resp.Memo., Exh. T.

Petitioner then filed an amended *habeas corpus* petition with this court, alleging that (1) the admission of Musmacher's statement inculpating the petitioner violated his right to a fair trial under *Bruton* and (2) his trial counsel rendered ineffective assistance in violation of his Sixth Amendment rights.[6] *See* Pet.Memo. Respondent countered that (1) any *Bruton* violation was cured by the trial court's instructions to the jury to disregard evidence of Musmacher's statements, (2) any uncured *Bruton* violation was harmless error, and (3) the ineffective assistance claim was procedurally defaulted in state court. *See* Resp.Memo.

## II. Discussion

### A. Procedural Bar

Before discussing the merits of Ryan's petition, the court must decide whether procedural bars require dismissal of any of Ryan's claims. The state argues that the petitioner's claim of ineffective assistance is barred because the petitioner did not raise the issue in his direct appeal and the Suffolk County Court ruled petitioner's 440 application procedurally defaulted. Unfortunately for petitioner, the state has a winning argument.

It is well settled that if "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas* review of the claims is barred" absent a showing of cause for the default and actual prejudice or a showing that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Procedural default will only bar *habeas* review if "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S.

---

**6.** In his original petition, Ryan included additional claims that he was deprived of due process of law because the state court erroneously (1) refused to retroactively apply its holding in *People v. Burts*, 78 N.Y.2d 20, 571 N.Y.S.2d 418, 574 N.E.2d 1024 (1991), (2) ruled the in-court identifications to be based on independent source, and (3) erroneously restricted evidence at the independent source hearing. *See* Orig. Pet. However, because petitioner's amended complaint, filed after retaining an attorney, made no mention of these claims and did not incorporate the original complaint, the court must deem these claims withdrawn.

255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Moreover, to be an adequate state procedural rule, the bar must be "strictly or regularly followed." *See Wedra v. Lefevre,* 988 F.2d 334, 339 (2d Cir.1993) (quoting *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)).

▮ In this case, the last state court rendering a judgment clearly and expressly stated that its judgment rested on two alternative state procedural bars: (1) because petitioner failed to raise his ineffective assistance claim on direct appeal and the claim appeared on the trial court record, he was automatically barred from 440 review under N.Y.Crim.Proc.Law § 440.10(2)(c), and (2) even if the petitioner could not have raised the claims on direct appeal, because petitioner failed to raise these claims in his first 440 application, the court was exercising its discretion to bar him from raising the claims in a successive 440 application under § 440.10(3)(c). *See People v. Ryan,* No. 682–86, at 3–4 (Suffolk Cty.Ct. Sept. 26, 1996), *available in* Resp.Memo., Exh. Q (citing CPL 440.10(2)(c)). The petitioner

does not appear to argue that either procedural rule is not regularly followed.[7] The County Court's dismissal of the petitioner's ineffective assistance claim thus rested upon an independent and adequate state ground. *See Coleman,* 111 S.Ct. at 2553–54.

In contending that his ineffective assistance claim is not procedurally barred, petitioner first appears to argue that the state court's ruling was erroneous. *See* Pet.Memo. at 32. However, it is well settled that, in conducting *habeas* review, federal courts must defer to state court determinations of state procedural law. *See Maula v. Freckleton,* 972 F.2d 27, 28 (2d Cir.1992) (citing *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)); *Burns v. Leonardo,* 1992 WL 368066, at *2 (E.D.N.Y.1992). Second, the petitioner argues that upholding the procedural bar in this case would precipitate the unfair result that a defendant "who has a series of ineffective defense counsel" would be cut off from *habeas* relief solely because of inexcusable errors by his counsel on direct appeal and on his first 440 applica-

---

7. In a footnote in the affirmation accompanying the amended petition, petitioner's counsel does allege that "in case after case, the Court of Appeals and the Second Department itself, informed defendants and defense counsel that claims of ineffective assistance of trial counsel are *not* properly raised on direct appeal, but instead must be raised in 440.10 proceedings at which an appropriate record can be made." Pet. Affirm. at ¶ 30 n. 6. Indeed, the New York Supreme Court has held that "[g]enerally, the ineffectiveness of counsel is not demonstrable on the main record ... [and] in the typical case it would be better ... that an appellate attack on the effectiveness of counsel be ... brought under CPL 440.10." *People v. Brown,* 45 N.Y.2d 852, 853–54, 410 N.Y.S.2d 287, 382 N.E.2d 1149 (1978). However, in this case, the County Court clearly found that all of the alleged grounds for petitioner's ineffective assistance claim *were* demonstrable on the main record and thus petitioner was procedurally barred by § 440.10(2)(c). *See People v. Ryan,* No. 682–86, at 3 (Suffolk Cty.Ct. Sept. 26, 1996). And even if the grounds for ineffective assistance were not demonstrable on the main record, the County Court ruled the petitioner proce-

durally barred by § 440.10(3)(c). The petitioner has not provided the court with any argument or case citations demonstrating that New York courts have not uniformly applied § 440.10(2)(c) or § 440.10(3)(c). Moreover, federal courts have repeatedly denied *habeas* relief on the basis of similar state court rulings that ineffective assistance claims were procedurally barred by § 440.10(2)(c), *see, e.g., Levine v. Commissioner,* 44 F.3d 121, 126 (2d Cir.1995); *Witt v. Walker,* 1993 WL 330503, at *4 (S.D.N.Y.1993); *Jones v. Senkowski,* 1992 WL 373683, at *2 (E.D.N.Y. 1992); *but cf. Moseley v. Scully,* 908 F.Supp. 1120, 1128 (E.D.N.Y.1995), and CPL 440.10(3)(c). *See Witt,* 1993 WL 330503, at *4. The one case in which a federal court concluded that New York courts had not uniformly applied § 440.10(2)(c) involved the application of the procedural bar to cases "where the defendant had the same trial and appellate counsel." *Moseley,* 908 F.Supp. at 1128. In the instant case, petitioner was represented by different counsel at trial and on appeal. *See* Pet. Affirm. ¶ 25. This court could find no cases where a federal court has questioned the uniform application of § 440.10(3)(c).

tion. *See* Pet. Reply Memo. at 4 ("Simply put, a defendant *must* have a forum in which he can raise his trial counsel's ineffectiveness."). While this court sympathizes with the petitioner's frustration, clear Supreme Court and lower court precedent holds that state procedural rules *can* cut a defendant off from *habeas* relief, even without providing a forum for deciding his ineffective assistance claim on the merits. *See Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Mackall v. Angelone,* 131 F.3d 442 (4th Cir.1997) (en banc), *cert. denied,* 522 U.S. 1100, 118 S.Ct. 907, 139 L.Ed.2d 922 (1998); *Hill v. Jones,* 81 F.3d 1015 (11th Cir.1996).

■ As a result, absent a showing of cause and prejudice or fundamental miscarriage of justice, this claim is unavailable for federal *habeas* review. The petitioner argues that the ineffective assistance provided to him by his counsel on appeal and/or on the 440 application constitute cause. *See* Pet. Reply Memo. at 5. Ineffective assistance of counsel *can* represent cause for a procedural default. *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). However, claims raised as cause for procedural default are also subject to the exhaustion rule and must have been presented to state court prior to the federal *habeas* petition. *See Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997). The petitioner has not raised claims of ineffective assistance of appellate counsel or of post-conviction counsel in state court, nor has he alleged these claims as separate grounds for *habeas* relief in the instant petition. "Thus, as [petitioner] has not alleged ineffective assistance as a separate claim and has not justified [his] failure to comport with New York State's procedural rules, [his] claim of ineffective assistance cannot be held as an adequate cause for [his] procedural default in state court." *Gaiter v. Lord,* 917 F.Supp. 145, 148 (E.D.N.Y.1996) (citing *Murray,* 477 U.S. at 489, 106 S.Ct. 2639); *see also Santos v. Keane,* 1997 WL 414121,

at *3 (S.D.N.Y.1997) (rejecting argument that ineffective assistance represents "cause" where "the petitioner raises his ineffective assistance claim for the first time on federal *habeas* review in order to show cause"). Because the petitioner has not alleged sufficient cause, the court need not address the question of prejudice.

Moreover, the petitioner has not even alleged a "fundamental miscarriage of justice." The fundamental miscarriage of justice exception is reserved only for those cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 495–96, 106 S.Ct. 2639. A petitioner can satisfy this exception only by demonstrating with " 'clear and convincing evidence that but for a constitutional error, no reasonable juror would have found petitioner [guilty].' " *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993) (quoting *Sawyer v. Whitley,* 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)). The petitioner has provided no evidence or argument to this court that he is actually innocent nor has he argued that, but for the ineffective assistance of counsel, no reasonable juror would have found him guilty. *See* Pet.Memo; Pet. Reply. As a result, the petitioner cannot overcome the state procedural bar, and this court cannot address the petitioner's ineffective assistance claim on the merits.

B. *Bruton* Claim

1. Violation

■ The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine adverse witnesses. *See Pointer v. Texas,* 380 U.S. 400, 406–07, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The defendant's Sixth Amendment confrontation right includes the "the right not to have the incriminating hearsay statement of a non-testifying codefendant admitted in evidence against him." *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994) (citing *Bruton v. United States,* 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476

(1968)). As the Supreme Court held in *Bruton*, codefendant's incriminations are not only "devastating to the defendant but their credibility is inevitably suspect.... The unreliability of such evidence is intolerably compounded when the alleged accomplice ... does not testify and cannot be tested by cross-examination." *Bruton*, 391 U.S. at 136, 88 S.Ct. 1620.

■ Where a codefendant's hearsay statement incriminating a defendant is admitted in spite of *Bruton*, the court is presented with a key question as to whether the statement "standing alone, would clearly inculpate [the nondeclarant] without introduction of further evidence." *United States v. Kyles*, 40 F.3d 519, 526 (2d Cir.1994). If the statement is clearly inculpatory, then no limiting instruction from the judge is sufficient "to cure the prejudice that such [a] violation[ ] may cause to a defendant." *Id.*

The petitioner contends that the trial contained repeated *Bruton* violations. First, the petitioner argues that the admission of testimony regarding Musmacher's allegation that petitioner committed the robbery while wearing the maroon leather coat seized from Musmacher upon arrest constitutes a *Bruton* violation. The court agrees.

■ In this case, the admission of testimony detailing Musmacher's hearsay statement that the petitioner wore the maroon leather jacket on the night of the robbery is clearly inculpatory. The respondent contends that the statement elicited by ADA Collins on cross examination was ambiguous and required additional evidence to become inculpatory. In essence, the respondent attempts to argue that, according to Detective Fanning's testimony, Musmacher's statement only established that the petitioner was wearing the jacket "at the time of the robbery", *see* Tr. Trans. at 532, and did not signify that he was perpetrating the robbery.[8] After reviewing the record, the court is skeptical that the jury needed additional evidence to determine that Musmacher's statement inculpated the defendant. But to the extent that any doubt existed, Fanning's testimony on recross by petitioner's counsel clarified the direct inculpatory nature of Musmacher's statement.[9] The fact that the inculpatory nature of Musmacher's statement was clarified on recross by the petitioner's own counsel is immaterial; it was a direct result of the original statement erroneously elicited by the prosecutor and admitted by the trial court.[10] As a result, this court holds that the statements by Musmacher introduced at trial clearly inculpated Ryan and thus, under *Bruton*, the court's subsequent jury instructions were insufficient to cure the resulting prejudice.

The petitioner also argues that his rights under *Bruton* were violated (1) by Detective Laghezza's statements on direct examination that Musmacher was cooperative with the police and that the police subsequently suspected the petitioner and (2) by the prosecutor's synopsis of this testimony on summation. *See* Tr. Trans.

---

**8.** In support of this unlikely interpretation of Fanning's testimony, the respondent argues that Musmacher's alibi witness placed the petitioner with Musmacher at Musmacher's house at the time of the robbery, *see* Tr. Trans. at 557, 560, 564, and thus the jury could have interpreted the testimony as noninculpatory. *See* Resp.Memo. at 17. However, as Fanning was the first defense witness, at the time Fanning testified to Musmacher's statement Musmacher's alibi witness had not testified.

**9.** As quoted above, Fanning affirmed that Musmacher told him that the jacket was worn

by petitioner "when he was supposed to have pulled the job." Tr. Trans. at 540.

**10.** Indeed, petitioner's counsel had expressed his opposition to the original admission of testimony regarding Musmacher's statement by immediately moving for a mistrial. *See* Tr. Trans. at 534. Once the judge decided to allow the evidence, the petitioner should not be penalized because his counsel understandably attempted to recross a witness who had provided damaging testimony regarding Musmacher's statement.

at 474–76, 725. On at least one occasion, the Second Circuit has found a *Bruton* violation in a situation where a police officer's statement regarding codefendant's cooperation is *directly* followed by a statement that the police then made the petitioner a suspect. *See Mason,* 16 F.3d at 40–41. However, in *Mason,* because of the immediate proximity of the witness's statements that he interviewed the cooperative codefendant and that the petitioner then became a suspect in the case, the jury could not have drawn any other conclusion than that the codefendant provided the police with information incriminating the petitioner. *See id.* In this case, Detective Laghezza testified that Musmacher was cooperative. *See* Tr. Trans. at 474. However, before stating that Ryan then became a suspect, Laghezza described two intervening investigative tactics: the checking of hotel registers and a meeting with the eyewitnesses. *See id.* at 475. Similarly, at summation, ADA Collins stated that Musmacher was cooperative after his arrest, that the police officers then talked to the eyewitnesses, and finally that they developed the petitioner as a suspect. *See id.* at 725. Both Laghezza's testimony and Collins's summation described intervening investigative tactics between the discussion of the codefendant's cooperative attitude and the development of Ryan as a suspect. Unlike in *Mason,* there is no direct chain of inference. The jury could not reasonably have assumed that the development of Ryan as a suspect resulted directly from the cooperation of Musmacher. As a result, the court does not find Laghezza's testimony or Collins's comments at summation to constitute a *Bruton* violation.

 Finally, the petitioner argues that his *Bruton* rights were violated by the prosecutor's description in summation of the maroon leather jacket as "the jacket to which has been much referral." *See* Tr. Trans. at 723. Though petitioner contends that this was a clear reference to the stricken testimony regarding Musmacher's

statement, this court cannot agree. Both before and after the *Bruton* violation, the petitioner's own counsel had stressed the fact that the jacket was a woman's jacket that did not fit his client. *See* Tr. Trans. at 529–30, 539–40. Indeed, petitioner's counsel introduced the jacket into evidence before the violation, *see id.* at 530, and induced petitioner to don the jacket in view of the jury. *See id.* at 539. Moreover, petitioner's counsel discussed the jacket's size, style, and fit at length in his closing. *See id.* at 695–98. As a result, the jury was far more likely to interpret the prosecutor's description of the jacket as referring to petitioner counsel's arguments regarding the jacket, than to the erroneously admitted Musmacher statement. The court finds that the prosecutor's closing does not violate *Bruton.*

### 2. Harmless Error

The court's finding that the admission of testimony regarding Mosbacher's statement directly inculpated the defendant and thus represented an incurable *Bruton* violation does not end the court's analysis. It is well settled that *Bruton* violations are subject to harmless error analysis. *See Schneble v. Florida,* 405 U.S. 427, 428, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Samuels v. Mann,* 13 F.3d 522, 526–27 (2d Cir. 1993). However, what standard of harmless error review to apply is a more complicated question. In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court held that the appropriate harmless error standard for federal *habeas* review of a state conviction is whether the error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 637, 113 S.Ct. 1710. While the majority of courts have applied this standard in all *habeas* cases, *see Hogue v. Johnson,* 131 F.3d 466, 498–99 (1997); *Davis v. Executive Director of Dep't of Corrections,* 100 F.3d 750, 773 n. 20 (10th Cir.1996); *Sherman v. Smith,* 89 F.3d 1134, 1140–41 (4th Cir.1996); *Tyson v. Trigg,* 50 F.3d 436, 446–47 (7th Cir.1995);

*Horsley v. Alabama*, 45 F.3d 1486, 1492 n. 11 (11th Cir.1995), some federal courts have held that the stricter *Chapman* harmless error standard should still be applied on *habeas* review in cases where harmless error analysis was not performed by state courts. *See Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir.1993); *Lyons v. Johnson*, 912 F.Supp. 679 (S.D.N.Y.), *aff'd on other grounds*, 99 F.3d 499 (2d Cir.1996). The Second Circuit has expressly declined to resolve this issue. *See Lyons*, 99 F.3d at 503.

In this case, careful scrutiny of the record of petitioner's direct appeal precludes the court from addressing this difficult question. On direct appeal, the government *conceded* that the admission of Fanning's testimony regarding Musmacher's statement constituted a constitutional violation. *See* Resp.Memo, Exh. B at 7–8. The government's sole argument on this issue was that the *Bruton* violation constituted harmless error. *See id.* In resolving the issue, the Appellate Division ruled that the claim was either "unpreserved for appellate review or without merit." *Ryan*, 166 A.D.2d at 619–20, 560 N.Y.S.2d 903. Since the issue was clearly preserved for appellate review,[11] *see* Tr. Trans. at 534 (motion for mistrial by petitioner's counsel immediately after introduction of offending testimony), and the government conceded the violation, the only possible basis for the state court's opinion was harmless error. As a result, this case falls squarely under the Supreme Court's holding in *Brecht* and thus triggers *Brecht*'s more deferential standard of harmless error review.

■ In order to satisfy the *Brecht* harmless error standard, the Second Circuit has made clear that the petitioner "must demonstrate that he suffered actual prejudice because the [constitutional viola-

tion] had a substantial and injurious effect or influence in determining the jury's verdict. *Habeas* relief is not available when there is merely a 'reasonable possibility' that trial error contributed to the verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir.1994) (quoting *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710). The court must determine whether this burden has been met "in light of 'the overall strength of the prosecution's case.'" *Dunnigan v. Keane*, 137 F.3d 117, 130 (2d Cir.), *cert. denied* —— U.S. ——, 119 S.Ct. 101, 142 L.Ed.2d 81, 1998 WL 273567 (1998) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir.1996)).

■ The Second Circuit has identified a number of factors for a district court to assess in a case of this nature. Perhaps the most significant factor is the weight of the prosecution's case. *See Glenn*, 98 F.3d at 729; *Samuels*, 13 F.3d at 526. In applying the *Brecht* standard, the court need only find the prosecution's case to be weighty, not overwhelming. *See Glenn*, 98 F.3d at 729. A second key factor is whether the erroneously admitted evidence was "crucial, critical, [or] highly significant." *See Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985).

■ In this case, the prosecution's case against the petitioner was not overwhelming. The direct evidence supporting Ryan's conviction consisted of the testimony and identifications of two eyewitness victims, buttressed by corroborating circumstantial evidence including the recovery of the maroon leather jacket from Musmacher containing quarters in similar packaging to those stolen,[12] the testimony of the taxi driver regarding his 3:00 a.m. pick-up on the morning after the robbery of a man of similar descrip-

---

11. Indeed, in its brief to the Appellate Division, the government did not even argue that the respondent failed to preserve *Bruton* claim. *See* Resp.Memo., Exh. B.

12. Once Musmacher's statement that petitioner was wearing the jacket at the time of the robbery is disregarded, evidence of the jacket's recovery implicates the petitioner only insofar as it corroborates the testimony and identifications by the eyewitnesses.

tion to petitioner from the same street as the codefendant's residence, and the testimony of the theater patron regarding the men of somewhat similar description to the defendants seen loitering outside the theater prior to the robbery and running from the theater thereafter. Despite extensive cross-examination by counsel for the petitioner and his codefendant, the testimony of the eyewitnesses was largely consistent, their descriptions of the robbers matched the appearance of the defendants, and their identifications were clear and unequivocal. Given the self-contradictory testimony offered by the petitioner's only witness, petitioner's defense rested virtually exclusively on the lack of inculpatory physical evidence and the inconsistencies in the eyewitnesses' testimony.

Courts in this circuit have repeatedly found cases based on multiple eyewitness identifications to be sufficiently weighty to warrant a finding of harmless error. *See United States v. Follette,* 430 F.2d 1055, 1058–59 (2d Cir.1970) (holding two eyewitness identifications to be sufficiently weighty evidence to render *Bruton* violation harmless); *Aziz v. Warden of Clinton Correctional Facility,* 1992 WL 249888 (S.D.N.Y.1992), *aff'd by summ. order,* 993 F.2d 1533 (2d Cir.1993) (holding credible eyewitness identification supported by corroborating description and seizure of gun resembling robbery weapon to be sufficiently weighty evidence to render *Bruton* violation harmless under *Chapman* standard); *Bradford v. Walker,* 1992 WL 81696 (E.D.N.Y.), *aff'd by summ. order,* 983 F.2d 1048 (2d Cir.1992) (holding eyewitness identification supported by corroborating descriptions to be sufficiently weighty evidence to render *Bruton* violation harmless). In this case, the court finds the two positive identifications by eyewitnesses, supported by corroborating evidence in the form of the quarters seized

from Musmacher and the similar descriptions from the taxi driver and the theater patron, to be weighty evidence.

Moreover, the court does not find the *Bruton* violation to be particularly damaging. Codefendant Musmacher's statement was not introduced during the government's direct case, but rather during cross and recross examination of a witness called by codefendant Musmacher. The jury was already aware of the substance of the testimony—that the government had reason to believe that Ryan was wearing the jacket during the robbery. *See* Tr. Trans. at 529. Indeed, it was petitioner's counsel that introduced the jacket into evidence as the jacket Ryan allegedly wore during the robbery in order to argue that it did not fit him and must have been worn by someone else. Musmacher's statement that petitioner was wearing the coat at the time of the robbery was not accompanied by any dramatic evidence, such as an admission of guilt by Musmacher.[13] *See id.* at 531–32, 539–40. Finally, during deliberations, the jury heard a read-back of Detective Laghezza's testimony absent the offending statement, further reducing any prejudice from the *Bruton* violation. *See* Tr. Trans. at 788; *supra* note 5. As a result, after careful examination of the *Bruton* violation in the context of the entire case, this court simply cannot find that the evidence was likely to have been critical or even highly significant to the jury's verdict.

This finding is supported by the minimal extent of testimony admitted regarding Musmacher's statement. The first reference to the statement consisted of one question by ADA Collins and Fanning's answer—a total of four lines of transcript. *See id.* at 531–32. On the second occasion, the direct reference to Musmacher's statement consisted of one question by petitioner's counsel, an aside between Fanning and the judge, and Fanning's answer—a

---

**13.** In many cases, *Bruton* violations take the form of evidence regarding a codefendant's admission of guilt coupled with inculpatory statements regarding nondeclaring codefend-

ants. *See, e.g., Bruton,* 391 U.S. at 124, 88 S.Ct. 1620; *United States v. Kyles,* 40 F.3d 519, 522 (2d Cir.1994).

total of six lines of transcript. *See id.* at 539–40. While ADA Collins and petitioner's counsel continued on to ask whether Fanning had recorded this conversation on tape or in writing, these questions added only an additional ten lines. *See id.* at 540–41. In all, the testimony regarding the statement amounted to twenty lines of transcript—the equivalent of less than one full page. By comparison, the testimony of the two eyewitnesses who identified the petitioner as one of the robbers went on for approximately 275 pages.[14] *See id.* at 59–229, 255–360. The erroneously admitted evidence was thus not only short in duration, but also, as discussed above, not particularly powerful in impact.

"[T]o conclude that the error was harmless in a case of this kind, we need not find that the improperly admitted evidence had no effect at all, we need only find that the effect was not substantial and injurious." *See Samuels,* 13 F.3d at 528 (citing *United States v. Rea,* 958 F.2d 1206, 1220 (2d Cir.1992)). In this case, this court finds that the improperly admitted evidence was neither "crucial, critical, [nor] highly significant." *Collins,* 755 F.2d at 19. Although the prosecution's case was not overwhelming, the two identifying eyewitnesses provided sufficiently weighty evidence to far outweigh the prejudice triggered by the *Bruton* violation. As a result, this court cannot conclude that the erroneously admitted evidence had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710, and thus the court holds that the *Bruton* violation constituted harmless error. The court must therefore deny petitioner's *Bruton* claim.

14. It should be noted that the numbers may not be entirely accurate because some of the pages of eyewitness testimony included sidebars as well as live testimony. Moreover, this court does not endow its quantitative analysis with undue emphasis, but merely offers it as one method of sketching the relative unimpor-

CONCLUSION

For the reasons set forth above, the petition for a writ of *habeas corpus* is DENIED. However, because the outcome of the harmless error analysis regarding the *Bruton* violation is " 'debatable among jurists of reason,' " *Nelson v. Walker,* 121 F.3d 828, 832 (2d Cir.1997) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)), the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). The petitioner's request for a certificate of appealability is therefore granted as to that issue. The Clerk of the Court is directed to enter judgment accordingly.

**SO ORDERED.**

tance of the *Bruton* violation. The court recognizes, of course, that twenty lines of very damaging testimony could outweigh hundreds of pages of less damaging testimony. However, as discussed above, the evidence admitted in violation of *Bruton* is equally weak on a qualitative basis.